## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

**SHANTEL WHITING**

       **Plaintiff,**

**vs.**

**ABBVIE, INC. f/k/a ALLERGAN HOLDCO US, INC, f/k/a ALLERGAN PLC, f/k/a ZELTIQ AESTHETICS, INC., and JOHN DOE CORPORATIONS 1-10,**

       **Defendant.**

_____/

## COMPLAINT

Plaintiff by and through undersigned counsel, files this Complaint against Defendant AbbVie, Inc., formally known as Allergan PLC, also formally known as Allergan HoldCo US Inc., also formally known as Zeltiq Aesthetics, Inc., and allege as follows:

### PARTIES

1. Plaintiff, **Shantel Whiting** is a citizen and resident of Okaloosa County, Florida.

2. Defendant, **AbbVie, Inc.** ("AbbVie") is a corporation formed under the laws of the State of Delaware with a principal place of business and headquarters located at 1 North Waukegan Road, North Chicago, IL 60064 and may be served with process upon its registered agent: Corporate Creations Network, Inc., 350 S. Northwest Hwy Suite 300, Park Ridge, Illinois 60068.

3. Defendant, **Zeltiq Aesthetics, Inc**. ("Zeltiq") is a corporation formed under the laws of the State of Delaware with a principal place of business located at 4410 Rosewood Drive, Pleasanton, California 94588 and may be served with process upon its registered agent: Corporate Creations Network, Inc., 801 U.S. Highway 1, North Palm Beach, Florida 33408.

4.      Defendant, **Allergan HoldCo US, Inc.** ("Allergen US") is a corporation formed under the laws of the State of Delaware with a principal place of business located at 2525 Dupont Drive, Irvine, California 92612 and may be served with process upon its registered agent: Corporate Creations Network, Inc., 801 U.S. Highway 1, North Palm Beach, Florida 33408.

5.      Defendants John Does 1-5 are individuals or entities unidentified to Plaintiff, including, but not limited to, other practice groups of which negligent healthcare providers were agents and/or employees of AbbVie, who, at material times, provided medical care and/or treatment to Plaintiff, Shantel Whiting (hereinafter referred to as "Ms. Whiting"); and/or other individuals or entities who were in association with, in business with, partners of, agents, employees of, or members of, the Defendants named herein or other John Doe Defendants who, at material times, supervised, controlled, or directed the work of any healthcare provider who provided medical care or treatment to Ms. Whiting, so as to incur liability. Such Defendants will be identified and named when their identity becomes known to Plaintiff.

6.      On April 28, 2017, Allergan PLC and Allergan US (hereinafter collectively referred to as "Allegan") acquired Zeltiq for the purchase price of $2.48 billion. Since Allergan's acquisition of Zeltiq, Allergan has held itself out as the owner of the CoolSculpting System and had/has apparent dominion and control over all aspects of the CoolSculpting business including the manufacturing, labeling, advertising, distribution, and sale of the medical device and its consumables.

7.      On May 8, 2020, AbbVie acquired Allergan and Zeltiq for the purchase price of $63 billion, took control of the companies' assets and liabilities, and is now the owner of the CoolSculpting System medical device.

8.     CoolSculpting treatments have been provided to clients under three potential Defendants: Zeltiq (2008-2017), Allergan (2017-2020), and AbbVie (2020) (hereinafter collectively referred to as "Defendants").

9.     At all times material, the Defendants' CoolSculpting manufacturing headquarters were, and currently are located at 4410 Rosewood Drive, Pleasanton, California 94588. Prior to operating from that address, the CoolSculpting business operated from 4698 Willow Road, Pleasanton, California 94588. Defendants have designated both Pleasanton addresses as its official CoolSculpting business office. Defendants also operated manufacturing and assembly facilities for the CoolSculpting device in Dublin, California and Livermore, California.

10.     Prior to April 2017, Zeltiq was the entity responsible for designing, manufacturing, and marketing the CoolSculpting device. On March 23, 2017, Zeltiq issued a notice to its shareholders of a Special Meeting to vote on the adoption of "the Agreement and Plan of Merger, dated as of February 13, 2017, by and among Allergan Holdco US, Inc. (Allergan US) and ZELTIQ" which, if passed, would make Zeltiq "a direct wholly-owned subsidiary of Allergan US." The merger was successfully completed on April 28, 2017.  Zeltiq announced the completion of the merger, stating that Zeltiq will "remove the Company Common Stock form listing on NASDAQ." After the merger, the directors of Zeltiq were terminated pursuant to "the terms of a separation agreement and release."

11.     On May 8, 2020, AbbVie fully and completely merged with Allergan. Allergan's stock was dissolved, and shareholders received AbbVie stock.[1] AbbVie announced the merger with a press release, stating that "Allergan shareholders will receive 0.8660 AbbVie shares and $120.30 in cash for each Allergan share, for a total consideration of $193.23 per Allergan share

---

[1] U.S. Securities and Exchange Commission, 8-K Form Allergan PLC (2020),
https://sec.report/Document/0001193125-20-137717/.

(based on the closing price of AbbVie's common stock of $84.22 on May 7, 2020). Allergan common stock ceased trading on the New York Stock Exchange as of the close of trading today."[2] Consistent with the acquisition, Allergan's executives were terminated, and AbbVie became the new owner and responsible party for CoolSculpting.[3]

12.     Defendants entered into contracts, obtained revenue, and conducted business in the State of Florida to sell, promote, and advertise the CoolSculpting medical device.

13.     Defendants, at all times relevant herein, were in the business of creating, designing, testing, manufacturing, labeling, advertising, marketing, promoting, selling, and distributing their CoolSculpting device into the stream of commerce for use by the public, including Ms. Whiting.

14.     Defendants expected or should have expected their acts to have consequences within the State of Florida as they derive substantial revenue from interstate commerce within the United States of America, including in the State of Florida.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction pursuant to 28 United States Code Section 1332, in that Plaintiff is a citizen of a state which is different from the state where the Defendants are incorporated and have their principal places of business. The amount in controversy exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), exclusive of interest and costs.

16.     Defendants, at all relevant times, were in the business of creating, designing, testing, manufacturing, labeling, advertising, marketing, promotion, selling, and distributing their CoolSculpting System through CoolSculpting providers and jointly placed the CoolSculpting system into the stream of commerce for use by the public, including Ms. Whiting.

---

[2] AbbVie Completes Transformative Acquisition of Allergan, AbbVie, https://news.abbvie.com/news/press-releases/abbvie-completes-transformative-acquisition-allergan.htm (last visited Mar. 1, 2022).
[3] U.S. Securities and Exchange Commission, 8-K Form Allergan PLC (2020).

17.     This Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with Florida and regularly conducts business within Florida such that exercising jurisdiction over Defendants would not offend due process or traditional notions of fair play and substantial justice.

18.     Venue is proper in this district pursuant to 28 U.S.C. §§1391(b)(2) and 1391(c)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the Defendants are subject to this Court's personal jurisdiction.

## GENERAL ALLEGATIONS

19.     This lawsuit arises from a popular non-invasive fat reducing medical device called the CoolSculpting System. This products liability action seeks recovery for the severe personal injuries, disfigurement, pain and suffering, and other damages sustained by Ms. Whiting as a result of the use of the  Defendants' CoolSculpting device.

20.     The Defendants created, designed, developed, manufactured, distributed, labeled, advertised, marketed, promoted, and/or sold their CoolSculpting device to be used on individuals to induce lipolysis (the breaking down of fat cells) in the body.

### COOLSCULPTING SYSTEM

21.     CoolSculpting is an elective body contouring procedure that is purports to work by using a process called Cryolipolysis® to freeze fat cells.  Cryolipolysis® is based on the theory that fat tissue is more vulnerable to cold temperatures than the skin; therefore, if cold is applied to a person's unwanted fat bulge, the cold temperature will allegedly kill the fat cells. Persons undergoing the procedure are expected to see "results" one to three months after the procedure, as the fat cells wither away in the treatment area.

22.     The CoolSculpting System device consists of several parts, including the main control unit (the body of the device), multiple applicators (arms extending from the body), gel pads for the applicators, massage function, consumable cards, liners, pretreatment skin wipes, and securement systems.

23.     The CoolSculpting System works by pulling the flesh of the treated area between two paddles and cooling the skin to below freezing temperature for a period of thirty minutes or more to kill the fat cells in that area.



Figure 1: Vacuum Applicator

## FDA TIMELINE

24.     The CoolSculpting System is a Class II medical device, approved through the U.S. Food and Drug Administration's 510(k) process on or about May 31, 2006 as a skin cooling device to minimize pain and thermal injury during laser and dermatological treatments and as a local anesthetic for procedures that induce minor local discomfort.

25.     The U.S. Food and Drug Administration ("FDA") did not clear Defendants' CoolSculpting device to be used to induce lipolysis until May 20, 2009, approving it only for the flank area. On May 2, 2012, the FDA expanded its 510(k) clearance regarding Defendants' CoolSculpting device to include inducing lipolysis in the abdomen.

26.     Defendant Failed to Update Freeze-Detect Software-Manufacturing Defect

6

27. Upon information and belief, Defendant did have recorded software events with the CoolSculpting system.

28. Changes were made to the predicate K183514 system hardware and software to allow two treatments to be performed simultaneously.

## FDA TIMELINE

| Company | Date | Approval Number | Area Treated |
|---|---|---|---|
| **Zeltiq Aesthetics Inc** | 5/02/2008 | K080118 | Minimize pain and "**temporary** reduction in appearance of cellulite" |
| **Zeltiq Aesthetics Inc** | 5/20/2009 | K090094 | Reduce appearance of cellulite, lipolysis of flank area |
| **Zeltiq Aesthetics Inc** | 5/2/2012 | K120023 | Added lipolysis of abdominal area |
| **Zeltiq Aesthetics Inc** | 4/9/14 | K133212 | Added thigh area |
| **Zeltiq Aesthetics Inc** | 1/26/15 | K142491 | Flexible treatment parameter ranges |
| **Zeltiq Aesthetics Inc** | 9/24/15 | K151179 | Software functions to monitor tissue during cooling and minimize risk of damage to tissue. Submental area added |
| **Zeltiq Aesthetics Inc** | 3/23/16 | K160259 | Added bra fat, back fat, banana roll. First report to FDA of 6 cases of paradoxical hyperplasia (abdomen, back and flanks)-SAE low at 0.13%. |
| **Zeltiq Aesthetics Inc** | 11/21/16 | K162050 | As part of vacuum applicator, Zeltiq developed a new applicator called CoolAdvantage. The CoolAdvantage has interchangeable contours to accommodate body areas of different curvature. The contours are in the shapes of previously cleared vacuum applicators (CoolCurve, CoolFit, CoolCore -DEN090002 and K133212. Treatment parameters are the same as vacuum applicators K142491. |
| **Zeltiq Aesthetics Inc** | 1/14/17 | K183514 | Added new software and operating system upgraded from Window CE to Windows 10. Increased BMI to 46.2 for treatment of submental and submandibular area. |
| **Allergan Purchase of Zeltiq Aesthetics, Inc** | 4/27/17 | | |
| **Zeltiq Aesthetics Inc** | 7/7/17 | K17069 | Developed 2 new vacuum applicators – 1-CoolAdvantage Plus and CoolAdvantage Petite that |

| | | | |
|---|---|---|---|
| | | | were modified in size to accommodate different sizes of fat bulges. Upper arm added to treatment area. |
| **Zeltiq Aesthetics Inc** | 11/1/17 | K172144 | Added treatment of lax tissue in submental area |
| **Zeltiq Aesthetics Inc** | 8/29/18 | K181740 | Increased BMI to 46.2 for treatment of submental and submandibular area. |
| **Zeltiq Aesthetics Inc** | 1/21/20 | K193566 | The applicator cup has been updated to provide a single assembled unit incorporating the contour, thus eliminating the need for a gasket. Changes were made to allow one or two simultaneous treatments. The control unit was updated to allow dual applications at one time. |
| **AbbVie Purchase of Allergan** | 5/8/20 | | |

**FDA Never Approved CoolSculpting as a Device to "Kill Fat Cells"-Misbranded**

29.    The FDA approved the CoolSculpting System as a medical device that "reduce[s] the appearance of cellulite." No studies, reports, or the use of other substantially equivalent devices support the premise that the CoolSculpting System "kills fat cells."

30.    Defendants have launched a fraudulent marketing campaign that mischaracterized the FDA approval of the CoolSculpting System for "reducing the appearance of cellulite" into a full-scale misbranding of the device as capable of "[k]illing fat cells".

31.    The problem with the CoolSculpting System is twofold. First, the CoolSculpting device cannot ensure that **any** of the fat cells it targets will actually die. Second, even if *some* fat cells die, the effect is minimal and temporary.

32.    On October 25, 2016, Andrea Levine, Esq. representing the National Advertising Division "NAD", referred the untruthful advertising claims about CoolSculpting to the Federal Trade Commission. Zeltiq agreed to discontinue fat elimination claims and follow most but not all

of the NAD's other recommendations. The NAD referred the matter to the FTC because Zeltiq refused to add the NAD's recommended disclosures to its advertising.[4]

33.     Moreover, even when the CoolSculpting device actually kills some targeted fat cells, the unwanted fat bulges easily return because the device does not eliminate all fat cells in the targeted area. The void is quickly filled by the expansion of surviving fat cells, resulting in a total reversal of the effect.

34.     When the CoolSculpting device **does not** kill the fat cells it targets during the procedure, and the cells survive the **cryo-assault** of CoolSculpting, the tissue goes into cellular adaptation mode.

### CELLULAR ADAPTION TO COOLSCULPTING

35.     In 2007, Zeltiq became aware that its CoolSculpting device was causing some patients to develop a condition that results in the opposite effect of the device's advertised purpose – a permanent increase in the size of the treated fat bulges.

36.     PAH is a permanent condition that is developed only as of the result of undergoing Cryolipolysis® via the CoolSculpting device.

37.     PAH causes permanent pathological change to the microstructure of the tissue in the CoolSculpting treatment area, affecting various types of cells, including adipocytes, vascular cells, blood cells, macrophages, endothelial cells, stem cells, and interstitial cells.   The tissue affected by PAH becomes fibrous, resulting in enlarged and sometimes hardened tissue masses that cause disfigurement.  This fibrous tissue is dead tissue, not an overgrowth of healthy tissue, which must be surgically removed from surrounding healthy tissue.

---

[4] *https://www.ftc.gov/system/files/documents/public_statements/994093/coolsculpting_resolution_letter.pdf*

38.     PAH affected tissue does not react the same to weight loss as regular fat. No matter how much weight a person loses after developing PAH, the affected area will never get smaller. The deforming effect of PAH remains permanently and can only be removed surgically.

39.     The types of reconstructive surgeries and procedures necessary to remove PAH include, but are not limited to: power assisted liposuction, liposculpture, excision, abdominoplasty, and laser treatment to remove surgery scars.

40.     Since PAH changes the character of the subcutaneous tissue, removing the fat tissue with liposuction is a difficult process. The affected tissue becomes lumpy, fibrous, and scar-like, which requires the surgeon to use more invasive and aggressive methods to remove the PAH tissue, resulting in longer recovery time and unpredictable results.   Even with surgeries, a full reconstruction of the affected area is not guaranteed, and the long-term consequences of developing PAH are still unknown.

41.     A person with PAH is at risk for future health and aesthetic problems, including the return of the deformity years after surgery.

42.     At this time, the only known prevention of PAH is abstaining from CoolSculpting.

43.     According to Defendants, "the CoolSculpting procedure is not technique dependent, does not require significant training or skill and is largely automated."[5] A medical doctor is not required to administer the CoolSculpting treatment. Instead, the CoolSculpting machine incorporates the use of Freeze-Detect software technology. The original operating system for the Zeltiq CLNI Dermal Cooling Device K181740 was Windows CE. The software was

---

[5] U.S. Securities and Exchange Commission, Form 10-K Zeltiq Aesthetics, Inc. (2015),
https://www.sec.gov/Archives/edgar/data/1415336/000162828016012690/zltq-12312015x10k.htm (last visited Mar. 1, 2022).

updated to Windows 10 in 2017. The software has two components: the Control Unit and the Applicator.

44.     CoolSculpting's theoretical premise is based on the fact that the human body has a certain number of fat cells that do not change during the course of a person's life. The CoolSculpting device can allegedly reduce the number of fat cells through Cryolipolysis® treatments or "cold-assisted lipolysis (breakdown of fat)."[6]

45.     Currently, the FDA has cleared Defendants' Cryolipolysis® CoolSculpting device as a Class II prescription medical device for lipolysis of the following areas: upper arm, bra fat, back fat, banana roll (underneath the buttocks), thighs, abdomen, flank ("love handles"), submental, and submandibular areas.[7]

46.     A person may undergo multiple cycles in one CoolSculpting session, depending on the size of the area they desire to treat with Cryolipolysis®.

47.     CoolSculpting is a relatively expensive procedure. An average session of CoolSculpting costs $2,000-$4,000, at an average price per cycle (one application of the device) of $650-$800.

## LEARNED INTERMEDIARY NOT APPLICABLE FOR PHYSICIAN OR NON-PHYSICIAN AGENTS

48.     The CoolSculpting System is FDA approved for use in dermatological and plastic surgeons' offices by prescription only.

### A.  Non-Medical Professionals Offer CoolSculpting System

---

[6] U.S. Securities and Exchange Commission, Form 10-K Zeltiq Aesthetics, Inc. (2015)
[7] Letter from Long H. Chen, Assistant Dir., U.S. Food and Drug Administration, to Tammy Whorton, Senior Manger Regulatory Affairs, Zeltiq Aesthetics, Inc. (Jan. 21, 2020), https://www.accessdata.fda.gov/cdrh_docs/pdf19/K193566.pdf.

49.     Apart from the FDA-approved uses, Coolsculpting Certified™ offices exist in both medical and non-medical spas. In fact, Defendants have awarded several non-medical professionals a "CoolSculpting University Masters" and expressly allows and encourages these individuals to market themselves as a "CoolSculpting Master Specialist" to the general public.

50.     CoolSculpting is often performed by estheticians, non-medical professionals who typically perform facials, hair removal, and other beauty and skin treatments.

51.     A CoolSculpting provider must buy the CoolSculpting device and the consumable cards or cycles in advance from Defendants to operate the CoolSculpting System. The cards are essentially akin to a game token that must be inserted for the CoolSculpting device to work. This structure creates a "pay to play" scheme where Defendants and CoolSculpting providers are financially invested partners in this multi-million-dollar industry.

52.     Defendants utilize a "Practice Development Manager" to ensure that physicians meet sales quotas by initiating direct to consumer advertising as well as providing CoolSculpting providers with a clinic marketing package detailing specific practice protocols. The protocols include branding and digital marketing tactics, sales pitches for physicians and/or providers to use, and recommends that these physicians and/or providers recommend additional CoolSculpting sessions to patients.

53.     Defendant created a predatory sales environment that deprived consumers of being properly informed about the risk of Paradoxical Adipose Hyperplasia, also known as Paradoxical Hyperplasia ("PAH") which Defendants define as a "fatty overgrowth of tissue". However, Ms. Whiting's surgeon as well as others find actual fibrinous tissue changes. Defendants have failed to correctly define what PAH is for the medical community.

54.     Defendant withheld critical information about PAH from CoolSculpting providers and financially entangled itself in the providers' CoolSculpting business by controlling the practice of medicine.

**B.  Aggressive Marketing Required CoolSculpting Providers to be Business Partners and/or Agents of Defendants**

55.     Zeltiq introduced the CoolSculpting System in 2011 and by the second quarter of 2012 had sold 84,072 treatment cycles. Zeltiq's 2016 SEC filings revealed that Zeltiq employed two different marketing groups which identified 28.6 million consumers who would be interested in learning more about the CoolSculpting procedure after reading the product description.

56.     Based upon marketing research, Zeltiq realized they were out of sync with market demand, reporting only 135,000 non-invasive fat reduction procedures in 2014. Zeltiq told investors: "when we compare our potential audience to the number of procedures conducted we find that our market penetration is lower than 1%." [8]

57.     Therefore, Zeltiq adopted an aggressive strategy to **partner with physicians** through a pricing model that rewarded overselling CoolSculpting procedures.

### The Zeltiq Physician Strategy

58.     Beginning in 2014, Zeltiq laid out a methodical plan to selectively market and sell the CoolSculpting system, to dominate the body contouring market by  simultaneously establishing cooperative customer partnerships (with physicians) and a direct-to-consumer program. Zeltiq expanded its cooperative customer partnership program in 2016.

59.     Zeltiq also implemented a five-step practice marketing program designed to help establish "best practices" relating to patient treatment, staff treatment, front desk operations, and internal and external marketing-essentially controlling the physician's practice.

---

[8] https://www.sec.gov/Archives/edgar/data/1415336/000162828017002057/zltq-12312016x10k.htm

60.     At the core of this five-step program is Treatment-to-Transformation, or T2T, a customized assessment and treatment protocol, which Coolsculpting claims revolutionized the way  customers use CoolSculpting to deliver improved outcomes and high patient satisfaction. In essence, **Zeltiq controlled and implemented its own sales system in clinical physician practices**.

C.  **Franchise Target-Ideal Image Largest Co-Partner**

61.     From 2013 to 2015  Ideal Image, which is a large aesthetic chain, along with its affiliated franchises, was the largest physician-based partnership for Defendants.

## CoolSculpting University

62.     In late 2013, Zeltiq launched the first CoolSculpting training programs, CoolSculpting University ("CSU"). This program's curriculum included hands-on education, live treatments,  and  lecture-style  presentations.  In  2015,  Zeltiq  hosted  over 1,800 medical professionals from 865 offices worldwide at their CSU programs. Zeltiq held CSU trainings in Pleasanton, California and Reston, Virginia. Zeltiq also hosted nine satellite CSU programs internationally during the year of 2015. As a result of these co-partnerships, Zeltiq's revenue increased from $255.4 million in 2015 to $354.2 million in 2016, a 38.7% increase.

## Defendants' Physician Practice Development Manager

63.     Zeltiq created a rewards program, (f/k/a "Brilliant Distinctions Program")  but now known as Alle`, which is both a marketing tool and client membership program complete with an app where patients can monitor their account points and redeem points for CoolSculpting. As part of the program, Defendant's had patients sign  a Health Insurance Portability and Accountability Act ("HIPAA") release which unknown to the patient was used by PDM's to shop the client to CoolSculpting providers. Once the patient information was shared with a local physician partner

the patient received marketing materials from the physician partner and Defendants. The rewards program was aggressively used by Defendants' PDM to develop and grow physicians' CoolSculpting practices as well as to regulate pricing. As demand went up, the pricing on CoolSculpting procedures did not go down as expected from natural economic principles. The rewards program created a brand exclusive customer base and simultaneously exerted complete control over the pricing and physicians. Potential patients sign up for the Allè rewards program to gain a free cycle of CoolSculpting. However, Defendant also provided physicians with scripts to induce patients to treat other areas of the body and purchase additional cycles.

64.     Strict physician compliance was demanded by the PDM, who had the power to punish physicians who offered lower pricing for CoolSculpting. Defendants in essence became a business partner of each physician's practice and pricing could not be changed without the Defendant's permission. Clients cannot begin a cycle of treatment unless their physician or other provider uses the CoolConnect card which activates the Freeze-Detect software technology to provide the cycle of treatment. The physician and Defendants share in the profits for each cycle. The financial interest of the physician coupled with scripted sales pitches from Defendants removed any independent medical decision making about the safety and efficacy of CoolSculpting.

## PHYSICIAN PROFITS

65.     The global non-invasive fat reduction market size was estimated at USD 992.5 million in 2019 and is anticipated to register a compound annual growth rate ("CAGR") of 16.4% from 2020 to 2027.

66.     Defendants have masterminded a price-fixing system where they inject themselves into the provider's CoolSculpting practice and become entangled in the patient's medical treatment

so they can control pricing and dominate the fat reduction market. Defendants sell physicians the CoolSculpting machine and eZ card (a/k/a "CoolCards")starter packs for $189,062.50.[9]

67.     Physician Partners purchased CoolCards to receive benefits from the Crystal Program. The Crystal Rewards program is comprised of three tiers – Crystal, Preferred Crystal and Premier Crystal – each with a distinguishing set of benefits based on CoolCard purchases. CoolCards are inserted into the applicator to authenticate each CoolSculpting treatment. Qualifying practices will receive rebates on CoolCard purchases ranging from 2.5%-20% as well as special designation and listing status on coolsculpting.com's physician locator.[10]

68.     Defendants also enticed physician partners by offering to pay for 50% of the physician's advertising costs to promote CoolSculpting.[11]

69.     The CoolSculpting business system is strategically designed to financially benefit both the physician owner of the device and the Defendants.

70.      Defendants make **more** money selling the consumable cards to CoolSculpting providers than selling the actual CoolSculpting devices. In 2018, Allergan earned $235.3 million selling consumable cards and $126.3 million selling the CoolSculpting devices and applicators.[12] By controlling the consumable cards, the Defendants retains control of the CoolSculpting provider's clinical practice.

71.     Defendants also closely controlled and continue to control the CoolSculpting providers' sales methods and pricing of CoolSculpting cycles. During training on the device, Defendants devote a substantial part of the training time boasting about the device's potential to

---

[9] *Tcheupdjian v. Zeltiq Aesthetics, Inc.*, 1:16-cv-06787, DKT. 1, Compl. at 3.
[10] https://www.businesswire.com/news/home/20120821005567/en/ZELTIQ®-Aesthetics-Introduces-Crystal-Rewards-Program
[11] *Id.*
[12] *Allergan Reports Fourth Quarter and Full-Year 2018 Financial Results*, Allergan, https://allergan.gcs-web.com/news-releases/news-release-details/allergan-reports-fourth-quarter-and-full-year-2018-financial   (last visited Mar. 1, 2022).

substantially increase the providers' revenues and how to increase CoolSculpting sales by using various sales tactics. Defendants' training materials include sample scripts to use on prospective CoolSculpting patients and describe upselling methods such as having the patients return for a "follow-up appointment" where the provider has an opportunity to sell additional cycles, or by pre-selling CoolSculpting packages where the patient pays for multiple cycles in advance for future uses.[13]

72.     Defendants installed a cellular device inside each CoolSculpting machine that automatically reports information about each cycle administered by CoolSculpting providers **directly** to the Defendants. This platform, which is called CoolConnect, is used by the Defendants to obtain data from the CoolSculpting devices and use it to pressure CoolSculpting providers to sell more procedures. According to Keith Sullivan, Zeltiq's former CEO (2012 - April 2017), in an interview he gave to PRIME Journal, "[i]n this way, we know what we are doing, and we can show [the CoolSculpting providers] how they are doing such as if you're only treating flanks, why aren't you looking at their belly, and so on. The PDM[14] has the data to bring back to those accounts on a monthly or quarterly basis and follow their progress."[15]

73.     Likewise, at all times material, Defendants controlled how the CoolSculpting providers advertised their CoolSculpting services. Defendants established a minimum advertised price policy, restricting providers from independently setting and advertising prices for the CoolSculpting procedure and penalized providers that advertised a lower price for their CoolSculpting services.[16]

---

[13] Guidelines for CoolSculpting Success,
https://docplayer.net/docview/26/9289425/#file=/storage/26/9289425/9289425.pdf (last visited Mar. 1, 2022).
[14] " Practice Development Manager" means sales representative.
[15] Wendy Lewis, *Fat Chance Building a Better Body the Cool Way*, Prime Journal (May 18, 2016), https://www.prime-journal.com/fat-chance-building-a-better-body-the-cool-way/.
[16] *Id.*

74.     The physician and/or clinic pays Defendants a portion of the cycle price charged to the consumer for the CoolSculpting procedure, establishing the procedure as a clear joint venture between the healthcare provider and Defendants.

75.     Defendants promised CoolSculpting physicians and/or clinics that Defendants would cover liability claims for PAH through a Liposuction Program, which incentivized CoolSculpting Physicians to fraudulently conceal the risk of PAH from the public, including Plaintiff. The Liposuction Program will refund patients or pay for them to undergo one liposuction procedure to correct the effect of PAH in exchange for a release of liability benefiting both the Defendants and the provider. Not only did the "liposuction program" indemnify CoolSculpting providers, but it also mislead CoolSculpting providers to believe that PAH was a condition that could be successfully corrected with a single liposuction procedure, *if* required, and assured the physicians and/or clinics they had no risk of liability to CoolSculpting patients.

### D.  Direct Consumer Marketing

76.     The CoolSculpting System has received substantial press coverage in the national media since its clearance by the FDA for non-invasive, cosmetic body-contouring, including features on television shows such as *The Today Show*, *Good Morning America*, *The CBS Early Show*, *The Rachel Ray Show*, *The Dr. Oz Show*, *Extra*, *Nightline*, *The Doctors*, and *E! News*, and in magazines such as *O*, *Elle*, *Marie Claire*, *Allure*, *Men's Fitness*, *Town & Country*, *Elevate*, *W*, and *Vie*.[17]

77.     Defendants operated and still operates a website www.coolsculpting.com where they advertise CoolSculpting directly to the public and refers prospective patients to CoolSculpting providers in their geographical area.

---

[17] *Zeltiq Aesthetics, Inc. v. Daron Scherr, M.D. et. al.,* Case. No.: 2:15-cv-00186.

78.     In addition to intensely marketing the CoolSculpting device to the general public, Defendants aggressively pursue doctor's offices, medical spas, laser hair removal clinics, and other cosmetic procedure establishments to sell its CoolSculpting System device and induce them to add CoolSculpting to their list of medical procedures provided to their cosmetic patients.[18]

79.     Defendants also spent millions of dollars partnering with individual CoolSculpting providers, paying for local ads that promote the CoolSculpting services at the providers' clinics.

80.     Defendants' relationship with CoolSculpting providers differs from traditional relationships between medical device manufacturers and device users.

81.     After a consumer sees a CoolSculpting advertisement, he or she is directed to visit www.coolsculpting.com, which refers the consumer to a local CoolSculpting provider. When a consumer arrives at a CoolSculpting provider's office, he or she sees CoolSculpting posters and brochures which describe the benefits of the CoolSculpting procedure. The provider sells the procedure to the consumer using specific sales techniques according to the training that Defendants provided.   The provider uses special forms depicting the CoolSculpting trademark logo in administering the procedure.

82.     Ultimately, through a uniquely designed system which Defendants controlled, Defendants used CoolSculpting providers to sell CoolSculpting procedure on its behalf and effectively took away the CoolSculpting providers' independence in treating patients with the CoolSculpting medical device.

---

[18] U.S. Securities and Exchange Commission, Form 10-K Zeltiq Aesthetics, Inc. (2015).

**Medical Facts-Plaintiff Injury**

83.     In January 2018, Ms. Whiting underwent CoolSculpting treatment on her abdomen at the medical offices of Tara Harden, M.D. in Ft. Walton Beach, Florida.

84.     Ms. Whiting's CoolSculpting sessions were not performed under the supervision of a physician, nor was she informed of CoolSculpting's risks by a physician.

85.     Defendants downplay the risk of PAH in marketing as an adverse risk that can be resolved with liposuction. However, Ms. Whiting's PAH has not resolved following a liposuction procedure.

86.     Ms. Whiting was diagnosed with PAH by Benjamin Brown, M.D. and she underwent an abdominoplasty and circumferential trunk liposuction on July 18, 2018. However, she developed "massive amounts of skin necrosis in a very unusual pattern." Dr. Brown noted the skin necrosis was similar to the distribution of the CoolSculpting applicators.

87.     The tissue necrosis has left Ms. Whiting with unsightly scarring which would require additional surgery to correct.

88.     Dr. Brown noted fibro-glandular tissue at the base of the abdominal scars.

89.     Ms. Whiting's PAH (a/k/a "overgrowth of fat") caused her tissue to become fibrinous not overgrown fat as described by Defendants. Liposuction removes fat not all fibrinous tissue. Although Ms. Whiting had a Liposuction performed to remove the PAH it was not successful. Plaintiff has scarring and disfigurement along with continued expansion of this fibrinous tissue that Defendants incorrectly characterize as "overgrowth of fat"/PAH. Ms. Whiting will require surgical removal of the fibrinous tissue, additional liposuctions and a tummy tuck to correct the loose stretched skin.

90.     Just like the CoolSculpting advertisements promised, Ms. Whiting's CoolSculpting provider told her that she would see a 20-25% reduction in fat after the first session of CoolSculpting.

91.     At no point in time did anyone at Tara Harden, M.D.'s office tell Ms. Whiting that CoolSculpting may experience fibrinous tissue damage that causes PAH and skin laxity.

92.     As the direct and proximate cause of Defendant's conduct, Ms. Whiting was not properly informed about PAH prior to undergoing the CoolSculpting procedure.

93.     Had Ms. Whiting known that there was a chance that she could develop a condition that results in the opposite effect of the device's advertised purpose, she would not have undergone the procedure.

94.      Ms. Whiting's damages include past and future medical expenses, past and future pain and suffering, mental anguish, emotional distress, scarring, and bodily disfigurement.

### Defendant Exceeds Scope of FDA Label with Fraudulent Misrepresentations And Aggressive Marketing

95.     The FDA approval specifically states that all device labeling must be truthful and not misleading.

96.     Zeltiq coined the term CoolSculpting which is a marketing word for the scientific term Cryoliposis or in layman's terms "freezing fat".  As stated above, the theory is that cold temperatures will cause the slow death of fat cells over a one-to-three-month period which will cause a visual reduction in fat bulges. However, in trials, no studies were performed to confirm a reduction in fat cells. A 2012 National Clinical Trial was done to evaluate the feasibility of using Cryoliposis on the inner thigh area. One of the problems with the study is how fat reduction was measured. The 2012 NCT01517659 non-invasive reduction of the inner thigh study merely showed physicians' images of pre and post treatment areas of 45 female trial study participants. Efficacy

and safety in male patients were not analyzed in this trial. Additionally, trial participants were asked to maintain their weight and not lose or gain more than 5 pounds during the course of the study. Although follow-up visits were done over a 16-week period, the study does not document patient weight changes. Success was defined as ultrasound confirmed 1mm or greater reduction in fat layer thickness for the treated region. An ultrasound was used to estimate the body fat percentage of clinical trial participants based on the assumption it correlates closely with those of DEXA in both females ($r$= 0.97, standard error of the estimate = 1.79) and males ($r$ = 0.98, standard error of the estimate = 0.96).

97. A DEXA Scan is a dual-energy absorptiometry scanner that provides the body's composition of muscle and fat.

98. For the NCT 2012 study, success for CoolSculpting of the Inner Thigh was defined as a 1 mm reduction in fat thickness.   A 1 mm reduction is the size of the tip of a pencil.



99. Defendants exceeded the scope of the FDA label by misrepresenting that fat loss should be expected, by advertising and continuing to advertise CoolSculpting as a "nonsurgical" procedure intended to reduce stubborn fat bulges with "up to 20-25% reduction in fat layer thickness after a single session."[19]

_____

[19] Coolsculpting, https://www.coolsculpting.com/coolsculpting/ (last visited Mar. 1, 2022).

100.    Despite knowing that NCT 2012 trial study limited to the thigh area which only defined success as a 1mm fat reduction,  the marketing literature shows abdominal photos of a much larger misleading picture of fat reduction.



101.    Defendants contend that PAH is a rare and a temporary potential complication. But the CoolSculpting device can **permanently** damage the tissue in the area it targets causing healthy tissue to become fibrinous, creating a deformity on the patient's body much **larger** in size than the original "stubborn fat bulge." The condition does not resolve on its own, and unlike regular fat tissue, tissue affected by PAH does *not* respond to weight loss. Thus, the only method of removing PAH is through invasive surgery. The condition is solely attributed to the CoolSculpting device.

102.    CoolSculpting is advertised and marketed as a **non-invasive** and **surgery-free** alternative to liposuction and other fat reducing surgeries.

CoolSculpting₀ is not a weight-loss treatment–it's the #1 nonsurgical fat reduction treatment used by doctors.∗

* CoolSculpting is the treatment doctors use most for nonsurgical fat reduction.

103.    CoolSculpting promises to **reduce fat up to 20-25% after only one session**.



104.    CoolSculpting claims that the fat reduction after the procedure is "long lasting", and that the device permanently kills targeted fat cells. It boasts, "Our experts spent years developing the treatment, which features one-of-a-kind technology that quite literally freezes and kills fat cells."[20]



---

[20] *The Science of Fat Freezing*, CoolSculpting, https://www.coolsculpting.com/what-is-coolsculpting/ (last visited Mar. 1, 2022).

**Defendants Suppressed Adverse Medical Literature from FDA/Medical Providers**

105.    Upon information and belief, Defendants knew or should have known that its CoolSculpting device was associated with post-surgical tissue growth. Scientific research avenues, such as clinical trials and their resulting data, would have revealed this risk.

106.    Upon information and belief, since as early as 2011, Defendants began receiving complaints and/or adverse event reports from individuals and/or their physicians regarding postsurgical tissue growth in areas of the body treated with the CoolSculpting device.

107.    In some of these reports, these post-surgical growths were formally diagnosed as hypertrophy and/or hyperplasia.

108.    Nevertheless, Defendants failed to appropriately and/or adequately warn all physicians, healthcare providers, and the public, including Ms. Whiting, of the risk of developing post-surgical growths, including but not limited to PAH, from use of the CoolSculpting device.

109.    Defendants failed to appropriately collect and report post-market surveillance data regarding the number of adverse events reported from use of the CoolSculpting device.

110.    Upon information and belief, the original FDA approval in 2008 was to use the cooling system as adjunct therapy for pain control following laser surgery and the "temporary" reduction in appearance of cellulite. CoolSculpting is now advertised as a safe non-surgical way to "freeze and eliminate"  stubborn fat from nine different treatment areas.

111.    Although Defendants knew, since at least 2007, that PAH was a significant and serious adverse effect of its CoolSculpting device, Defendant failed to disclose these risks to the FDA until 2016.

112.    In 2016, Defendants informed the FDA of six cases of severe PAH in the abdomen, back, and flanks, asserting the risk of PAH was 0.13% out of 4,792 treatments in published studies.

113.    Soon after the CoolSculpting device hit the market, Defendants received multiple reports of patients developing "firm bulges" and fat tissue "increases" in the area treated with the Cool Sculpting device.

114.    In 2012, Defendant investigated this phenomenon and discovered the CoolSculpting device caused irreversible tissue damage that caused fibrous scar-like masses to grow on patients' bodies as a biological response to the trauma caused by the device.

115.    Defendant named the condition "Paradoxical Hyperplasia" and still uses this term to describe the condition. Internally, Defendant has also referred to the condition as Paradoxical *Tissue* Hyperplasia.

116.    In 2012, Defendant created its own diagnosis criteria for the condition, which it required CoolSculpting providers to use to diagnose PAH.

117.    By 2013, Defendant knew that the disfiguring bulges had to be removed surgically, through procedures such as liposuction and included abdominoplasty, excision, and panniculectomy.

118.    By 2013, Defendant calculated that the incidence rate of PAH was 1 in 3,500 patients, demonstrating that the number of people developing the condition was increasing exponentially.

119.    Since 2011, Defendant frequently and consistently received reports of consumers developing PAH after undergoing CoolSculpting procedures.

120.     Defendant knew that out of all adverse events associated with the CoolSculpting device, PAH was the **most serious** and the **most frequently** reported.

121.    Defendant implemented a confirmation system to re-evaluate reports of PAH remotely through its internal "Medical Safety Team" and rejected many reports of PAH, ignoring medical providers' diagnoses.

**Defendant's Used a "Medical Safety Team" To Suppress PH Diagnosis**

122.    Defendant took an active role in helping CoolSculpting providers diagnose PAH and mitigated the provider's liability exposure by offering the patients a refund or a paid for single liposuction treatment in exchange for a release of liability.

123.    Since PAH is a condition that was largely unknown by the medical community, CoolSculpting providers relied exclusively on Defendant for information about the condition.

124.    Defendant guided providers in determining whether the patient should be diagnosed with PAH through its "Medical Safety Team." Defendant's employees reviewed the patients' medical information and photographs and suggested to the CoolSculpting providers whether a patient should be diagnosed with PAH.

125.    Defendant's "Medical Safety Team" did not examine any patients. Instead, they essentially diagnosed patients without performing any diagnostic tests or examination.

126.    Defendant implemented a system that turned the adverse event reporting process into a claims process. Defendant instructed providers to submit Clinical Event Forms and other documents, including a copy of the consent form signed by the patient that describes PAH.

127.    The Clinical Event Form requested personal information such as the patient's full name, phone number, email address, and home address. Defendant used the information provided through the adverse event report to contact the patients directly and solicit a settlement in exchange for a release of liability.

128.    Defendant designed a treatment "program" for patients that developed PAH. The Defendant offered to cover the cost of **single** liposuction surgery or give a refund for the CoolSculpting treatment in exchange for a release of liability for any future damages associated with the patients' PAH. Defendant included the CoolSculpting providers as parties released from liability in the settlement agreements.

129.    Through the adverse event reports and its treatment program, Defendant became a centralized hub of information about PAH.

130.    Through this program, Defendant had direct communications with CoolSculpting providers and CoolSculpting patients that developed PAH, allowing Defendant to collect information not available elsewhere.

131.    Through this program, Defendant knew that the CoolSculpting providers used CoolSculpting consent forms that were either identical to or mirrored the language drafted by the Defendant in regard to PAH, which did accurately represent the condition to the patients.

132.    Through this program, Defendant provided assurance to CoolSculpting providers that if their patient developed PH after CoolSculpting, the manufacturer would cover the cost to fix the condition.

133.    Through this program, Defendants led CoolSculpting providers to believe that a single liposuction surgery could successfully resolve patients' PAH.

134.    If a CoolSculpting patient reported PAH directly to the Defendant, Defendant required the patient to return to their CoolSculpting provider and request an evaluation of their condition.

135.    Defendant instructed CoolSculpting providers to follow an extremely specific protocol for diagnosing patients with PAH, which resulted in many patients not being diagnosed

with PAH despite suffering tissue damage.  Defendant's diagnosis protocol only recognized fulminant cases with well demarcated masses as PAH, relying on the physicians' hand palpation of the affected tissue and a visual review of photographs taken of the patient before the procedure.

136.   If the CoolSculpting providers did not agree to cooperate with the CoolSculpting patients in diagnosing PAH, the patients were left on their own. In many cases, patients sought medical evaluation from providers that did not have any experience with the CoolSculpting device, lacked knowledge about PAH, and could not be effectively diagnose or treat the condition.

137.   CoolSculpting providers benefited directly from Defendant's refund or free liposuction program because they were released from liability for future damages if the patient accepted the offer.

138.   Moreover, if the CoolSculpting provider was a plastic surgeon, the provider would benefit directly from the patient's development of PAH because Defendant would offer to pay the provider to correct the condition through plastic surgery.

139.   Defendant's treatment program was insufficient to cover the true losses suffered by CoolSculpting patients. Defendant did not cover the cost of travel for surgery, any other surgeries required to remove PAH, lost wages during recovery, or any other damages directly resulting from the injury caused by their CoolSculpting device.

140.   Likewise, though Defendant performed its own studies on PAH to determine the cause of the condition, the findings of these studies were never distributed to CoolSculpting providers.

141.   Defendant's conduct of suppressing PAH diagnosis with a "Medical Review Team" and its refund or free liposuction treatment program violates the duty to report adverse events to the FDA and/or voluntarily recall the CoolSculpting System.

**Defendant's Secret White Paper -Not Disclosed to CoolSculpting Providers**

142.    Defendant knew that one liposuction treatment would not remedy PAH, and that multiple invasive surgeries would be required to do so.

143.    Defendant kept record of the reported incidents of PAH which included important data such as place of treatment, date of treatment, area(s) of the body affected, date PAH was diagnosed, etc. This data gave Defendant key information about the incidence rate of the condition.

144.    In 2012, soon after Defendant discovered that the CoolSculpting device could cause the development of PAH, the Defendant commissioned the inventor of the Cryolipolysis® process, Dr. R. Rox Anderson and his colleague at Massachusetts General Hospital, Dr. Mathew Avram, to author a document about this serious and permanent adverse effect, to which Defendant referred to as the "White Paper."

145.    The White Paper described the condition as follows: "[r]ecently, the manufacturer received eleven separately confirmed reports of patients who developed growth of soft tissue in the treated site(s) over several months following treatment. The soft tissue growth is painless, firm, and visibly enlarged within the treated areas. The enlargement typically started two to three months post treatment, often after the expected reduction in fat, becoming visibly evident at four to five months post treatments. Because the soft tissue enlargement is a rare, unexpected growth of subcutaneous fat tissue, this phenomenon is being termed 'paradoxical hyperplasia.'"[21]

146.    The White Paper also described very strict criteria for diagnosing PAH, admitting that the side effect is "significant" but rare.

---

[21] R. Rox Anderson, MD & Matthew Avram, MD, Paradoxical Hyperplasia: A Rare Side Effect associate with Cryolipolysis 1 (2012), https://skinrenu.com.au/wp-content/uploads/2017/03/13.PH-white-paper-FINAL.pdf.

147.    The White Paper also warned that "[p]atients who are considering undergoing this procedure should be counseled on the possibility of its occurrence, as well as the surgical options available should it occur."[22]

148.    The Defendant kept the White Paper a **secret** from CoolSculpting providers and **did not** disclose the document unless a provider insisted on obtaining additional information about PAH after one of their patients developed the condition.

149.    In some instances, Defendant even required the CoolSculpting providers to sign a **confidentiality agreement** before it disclosed the White Paper.

150.    When Defendant did share the White Paper with  providers, it always disclosed the November 30, 2012 version of the document, which acknowledged only eleven cases of PAH and was never updated to include the most current information.

151.    The White Paper, although more informative than the device's User Manual and Defendant's training presentations, was outdated and inadequate, failing to disclose the true risks of PAH.

**Defendant's Manufactured False Statistics about PH in Medical Journals**

152.    In March 2014, Dr. Anderson, Dr. Avram, and several professionals associated with the Defendant published a scholarly article called "Paradoxical Adipose Hyperplasia After Cryolipolysis" in JAMA Dermatology, announcing that "[v]ery rarely, a delayed increase in adipose tissue at the treatment site can occur, which to our knowledge has not yet been reported in the medical literature.[23] We suggest the term 'paradoxical adipose hyperplasia' (PH) for this phenomenon."[24]

---

[22] *Id.* at 4.
[23] *Jalian HR, Avram MM, Garibyan L, Mihm MC, Anderson RR. Paradoxical Adipose Hyperplasia After Cryolipolysis. JAMA Dermatol. 2014;150(3):317–319. doi:10.1001/jamadermatol.2013.807*
[24] Jalian, *supra* note 25, at 317-19.

31

153.    The JAMA article described the case of man in his forties who underwent the Cryolipolysis® procedure with the CoolSculpting medical device and initially noticed a reduction in fat tissue. However, three months after CoolSculpting, his fat grew into a noticeable mass despite maintaining his weight. He elected not to undergo invasive surgery to remove the deformity.

154.    The following photograph was provided:



155.    The article "estimated" that the incidence rate of PAH is about "0.0051%, or about 1 in 20,000 treated patients." It noted that "[t]o date, 33 confirmed cases of paradoxical hyperplasia have been reported to the device manufacturer as part of post marketing surveillance data."[25]

156.    At the time the article was published, Defendant was aware of **over 100 cases** of PAH.

157.    Defendant knew, based on the data gathered through their refund or free liposuction program and "Medical Review Team" that the number of PAH patients and the incidence rate cited by the authors were incorrect and grossly underestimated the risk, but Defendant failed to inform CoolSculpting providers, update the FDA label, or voluntarily recall the CoolSculpting system.

158.    Despite being aware of these inaccuracies, Defendant cited the 2014 JAMA article in its training slide presentations and in 2016 (and later) versions of its User Manual.

---

[25] *Id.*

159.   Defendant never directly notified CoolSculpting providers about its discovery of PAH or the information it possessed about the deforming condition.

160.   Instead, Defendant strategically used the misleading 2014 JAMA article in its training materials and User Manual and referred CoolSculpting providers who inquired about PAH to the article.

161.   From 2012 until the present, Defendant **never** updated the CoolSculpting System User Manual to reflect updated information about the true incidence of risk of PAH.

162.   Defendant also instructed its employees to use the word "rare" when referring to PAH in their communications with CoolSculpting providers, the public, and the FDA.

163.   Contrary to the 2014 JAMA article, which estimated "that the incidence rate of PH is about 0.0051%, or about 1 in 20 000 treated patients,"[26] an independent author reported the incidence rate of PH for the same time period was 0.010%, nearly twice as high as the statistic reported by Dr. Anderson and Dr. Avman, Defendant's consultants."[27]

164.   In March 2016, a group of independent  authors addressed the incidence rate of PAH as reported in the 2014 JAMA article stating, "Our reported incidence is **0.78 percent [1 in 129], more than 100 times higher than the device manufacturer reported incidence of 0.0051 percent.** Ours is not a unique experience, as a dermatology practice in Whiting, Texas, recently reported a paradoxical adipose hyperplasia incidence of 0.47 percent [1 in 213]. Although our treatment numbers are low when considering the popularity of the procedure, **we believe that paradoxical adipose hyperplasia is underreported**."[28] (emphases added).

---

[26] *Id.*

[27] William A. Stefani, MD, FACS, *Adipose Hypertrophy Following Cryolipolysis*, 35(7) Aesthetic Surgery Journal NP218, NP 219 (2015).

[28] Emma Kelly et al., *Paradoxical Adipose Hyperplasia after Cryolipolysis®: A Report on Incidence and Common Factors Identified in 510 Patients*, 137 Plastic and Reconstructive Surgery 639e-40e (2016), https://pubmed.ncbi.nlm.nih.gov/26809032/.

165.    A paid consultant for Defendant responded to this, stating that "[t]he manufacturer reports that since the first quarter of 2014, the paradoxical adipose hyperplasia incidence rate has fluctuated between 0.021 and 0.026 percent, or approximately one in 4000 treatment cycles."[29]

166.    An independent study published in November 2017 found that although the Defendants had reported thirty-three cases of PAH worldwide, estimating an incidence rate of 0.021%, the rate is "probably underestimated." The authors of the study, who were not associated with the manufacturer, found that the incidence rate of PAH in their study was 1% (4 out of 398 patients developed PAH). They noted that "many of the more than 2 million patients treated with cryolipolysis worldwide are affected by PH." [30]

167.    In response to this independent study, a solo practitioner plastic surgeon wrote that he saw two "fulminant PH" cases out of 150 patients, and that "10 other patients had what we considered unchanged or even worsened 'girth,' which in retrospect may represent a new classification of PH considered to be mild to moderate."[31]

### DEFENDANT FAILED TO PROVIDE ACCURATE DATE TO THE FDA

168.    Defendant downplayed the seriousness, permanency, and frequency of PAH to the FDA.

169.    On March 14, 2016, Defendant submitted a 510(k) Summary of Safety and Effectiveness report to the FDA, citing to "literature review" and reporting that there have been only "6 cases" of "serious adverse events" which include PAH.[32] By 2016, Defendant was aware

---

[29] Gordan H. Sasaki et al., *Cryolipolysis for Fat Reduction and Body Contouring: Safety and Efficacy of Current Treatment Paradigms*, 137 Plastic and Reconstructive Surgery, 640e-41e (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4444424/.

[30] Stroumza, *supra* note 24, at 414.

[31] James E. Vogel, MD, *Comments on 'Paradoxical Adipose Hypertrophy (PH) After Cryolipolysis,*' 38(9) Aesthetic Surgery Journal NP135-NP37 (2018), https://pubmed.ncbi.nlm.nih.gov/29982356/.

[32] *https://www.accessdata.fda.gov/cdrh_docs/pdf16/k160259.pdf*

of **thousands** of PAH reports. Accordingly, Defendant failed to report all known incidents of PAH to the FDA, despite the FDA's repeated requests to do so.

170.    PHA is a reportable adverse event under 21 C.F.R. § 803 due to the permanency and severity of the condition, and because surgical intervention is the only means to resolve it.

171.    Since the CoolSculpting device went on the market through September 2019, Defendant has received **thousands** of reports of PAH. Defendant reported **less than** 70 to the FDA's public database, MAUDE (Manufacturer and User Facility Device Experience).

172.    By failing to report Defendant maintains control of the information about the number of patients suffering from PH after CoolSculpting, as providers and the public cannot independently obtain the most current data via the FDA's public database.

**PRODUCT LABEL MISREPRESENTED**

### 1. *Inaccurate and Misbranded Labeling*

173.    Although Defendant provided **some** information regarding PAH to CoolSculpting providers, the information was misleading and led providers to believe that the condition causes a rare minor side effect which is not likely to occur or reoccur. The language used by Defendant did not relay the seriousness, permanency, and frequency of the condition.

174.    Defendant's inadequate disclosure about PAH **failed** to inform the CoolSculpting providers that:

    a.    PAH is the opposite effect of CoolSculpting's advertised purpose of fat reduction;

    b.    PAH is a disease of the tissue;

    c.    The CoolSculpting device can damage the tissue of the treated area;

    d.    PAH results in a physical deformity;

e.   A single patient can suffer multiple deformities on the body from PAH;

f.   The deformity will never resolve on its own because it is permanent;

g.   PAH changes the microstructure of the tissue;

h.   Multiple invasive surgeries are required to remedy the PAH affected tissue;

i.   Surgery may not resolve PAH affected tissue;

j.   The CoolSculpting device can cause cutaneous tissue laxity requiring surgery to cut, lift, and sew the skin;

k.   PAH has a wide range of physical effects on the body including lymphatic system issues;

l.   The frequency of occurrence of PAH is not rare and thousands of people have suffered from the condition after undergoing CoolSculpting;

m.   PAH was the most commonly reported adverse effect of CoolSculpting;

n.   CoolSculpting was FDA-cleared. This is not synonymous with FDA-Approved.

175.   Defendant falsely told CoolSculpting providers that using the device's smaller sized applicators eliminated or significantly reduced the occurrence of PAH.

176.   Defendant's labeling materials were uniform for all CoolSculpting providers, and the information contained therein did not differ materially from one CoolSculpting provider to another.

**PAH Risk Suppressed in Physician Training**

177.   Defendant used non-medical sales agents called Practice Development Managers ("PDMs") to provide training to Ms. Whiting's CoolSculpting provider and inform the provider about PAH.

178.    Defendant's PDMs were the primary points of contact for CoolSculpting providers to obtain and relay information regarding the CoolSculpting device. The PDMs provided training on operating the CoolSculpting device, provided information about the device's side effects, gave marketing advice, relayed information from providers to Defendant, and sold consumable cards to the CoolSculpting providers.

179.    The training provided by Defendant to CoolSculpting providers on the CoolSculpting device consisted mainly of sales tactics and emphasized the device's ability to increase the revenues of the providers' medical offices.

180.    The presentation slide that described PAH used the term "Paradoxical Adipose Hyperplasia" even though the Defendant knew that PAH was not an increase in healthy fat cells. In the slide, Defendants also misrepresented PAH as an "increase in subcutaneous adipose tissue," despite knowing that PAH causes **fibroplasia** or **fibrosis** of the subcutaneous tissue. Fibrinous tissue are dead cells that must be surgically debrided from healthy tissue. The slide also used a photograph from the 2014 JAMA article (*see supra ¶147*), which did not represent the majority of PAH deformities whose masses were not in the shape of the applicator. Furthermore, the slide also inaccurately stated that "surgical intervention **may** be required," though the Defendant knew that surgery **is** required.

181.    Defendant did not allow the PDMs to discuss PAH in detail with providers that posed specific questions. PDMs were instructed by Defendant to present only the misleading information about PAH from the training slide.

182.    Through its training slide presentation, Defendant assured providers that the CoolSculpting device precisely targets fat cells and does not damage surrounding tissue or structures.

183.    During training, Defendant's PDMs verbally told CoolSculpting providers that the likelihood of CoolSculpting patients developing PAH is very low and that they would be unlikely to see a case of PAH in their practice.

**DEFENDANT'S MISREPRESENTATIONS ABOUT PH TO COOLSCULPTING PROVIDERS**

184.    Defendant knew that CoolSculpting providers were not independently familiar with PAH and that they relied on Defendant for information about the condition that is solely associated with the CoolSculpting device.

185.    Despite Defendant's extensive knowledge about PAH, the information released to CoolSculpting providers was **de minimis** and **deceptive.**

186.    Importantly, Defendant did not provide information regarding PAH to CoolSculpting providers **prior** to their purchase of the medical device.

187.    After the devices were purchased, Defendant downplayed the severity, permanency, and frequency of PAH to CoolSculpting providers.

188.    Defendant also advised CoolSculpting providers not to mention "Paradoxical Adipose Hyperplasia" or "PH" to patients who requested an evaluation for the condition until the Defendant's claims department had an opportunity to review the patients' medical records and "confirm" the diagnosis.

189.    Defendant implemented a practice of rejecting CoolSculpting patients' diagnoses of PAH and refused to confirm cases of PAH in all the affected body parts. For example, in one CoolSculpting patient's case, although she was diagnosed with PAH to her entire abdomen by multiple physicians, Defendant refused to confirm PAH to her upper abdomen.

> Date: December 30, 2019 at 1:40 PM
> Subject: Allergan CoolSculpting - Clinical Case PR 2034503
>
> Hi Paula,
>
> I am sorry I did not get you sooner, I was gone due to the holiday and I am catching up on emails.
>
> The case was reviewed and the Medical Safety Assessment reviewer deemed your mid and lower abdomen consistent with paradoxical adipose hyperplasia (PH). The reviewer was unable to deem the upper abdomen consistent with PH. I will have to send the case for supplemental medical assessment for review of your upper abdomen.

190.     Due to Defendant's failure to adequately warn CoolSculpting providers about PAH, the providers did not have an accurate understanding of the condition and were unable to properly inform their patients about its risks.

191.     Moreover, Defendant was aware that CoolSculpting providers did not understand PAH and were not properly informing their patients about the possibility of developing this serious condition after CoolSculpting. Defendants' direct communications with persons who developed PAH and posts from personal accounts online clearly demonstrated that CoolSculpting patients were not adequately informed on the risk of developing the condition.

192.     For example, even as late as January 2019, CoolSculpting providers cited a range of incorrect incidence rate statistics in their responses to prospective CoolSculpting patients on the popular review website www.RealSelf.com:

## 9 Answers

By Board Certified Doctors and Qualified Medical Professionals

### A: Paradoxical hyperplasia

Thank you for your question! Paradoxical hyperplasia is reported to be 0.00005% risk and more common in males. There is no way of knowing if one person is more at risk of developing it over another. But the good news is that is rare!  You sound like a good Coolsculpting candidate based on numbers but of course a consultation is the best determining factor.

As far as the person doing the treatments you need to ask how long they have been performing the treatments and how long they have been certified for. Look at THEIR before and after photos to see if you are happy with their results. It does not take a medical license to perform the treatments, so the technician or nurse might be more qualified and better trained. Every practice is different so feel free to treat the consultation as an interview to see if you feel comfortable with the provider.

show less ▲

**Kate Szal at:**
Aspira
★★★★★ (10)
*2 people found this helpful.*

Answered: 9 Jan 2019

[ HELPFUL ]

### A: CoolSculpting

Dear cosmeticcurls,

Great question! The statistic for PAH is 0.0036%. PAH is less common with newer applicators.

- Dr. Edward Tangchitnob



193.    On March 19, 2019, a plastic surgeon described his experience of attempting to obtain information about the incidence rate of PAH from his CoolSculpting representative after he observed three PAH patients within a period of six months:

> I imagine that the incidence of this complication, paradoxical adipose hyperplasia, is exceedingly rare. When I asked one of the representatives from the company about its incidence, he reassured me that this condition occurs in one out of 70,000 cycles. As I have seen three patients in the past six months with this condition, I wonder if this is underreported or if the technology is that exceedingly popular. In any case, I believe it is in the best interest of my patients to understand what paradoxical adipose hyperplasia (PAH) is, what it means, and how it can be treated.

[33]

194.    Contrary to the statistics cited by CoolSculpting providers, a recent study suggested that the incidence rate of PAH in CoolSculpting patients is closer to 1 in 100, or 1%.[34]

195.     Adverse events with an incidence rate of 1% or higher are considered "common," not rare, by the World Health Organization.[35]

---

[33] *Paradoxical Adipose Hyperplasia: A Rare but Treatable Complication of CoolSculpting*, Zelken Institute (Mar. 9, 2019), https://zelkeninstitute.com/2019/03/19/paradoxical-adipose-hyperplasia/ (last visited Mar. 2, 2022),
[34] Stoumza, *supra* note 24, at 412; Vogel, *supra* note 37, at NP135.
[35] Erica Wang, MD et al., *Commentary on: Paradoxical Adipose Hypertrophy (PH) After Cryolipolysis*, 38(4) Aesthetic Surgery Journal 418, 419 (2018).

196.    The actual incidence rate of PAH after CoolSculpting may be closer to 10% when considering the number of CoolSculpting patients that developed mild to moderate cases of PAH, which do not present as well-demarcated masses and remain undiagnosed.

**FIRST CLAIM FOR RELIEF**
**STRICT PRODUCT LIABILITY**
**DESIGN, MANUFACTURE AND FAILURE TO WARN**

197.    Plaintiff repeats and incorporates by reference all prior paragraphs as though fully set forth herein.

198.    The CoolSculpting System used on Ms. Whiting in January 2018 was designed and/or manufactured in violation of the Federal Food, Drug and Cosmetic Act ("FDCA") and regulations promulgated pursuant to it, including but not limited to improper workmanship, failure to update and validate Freeze-Detect Software, which caused defects in the CoolSculpting system during the manufacturing process and/or during use of the device. The failure of the Freeze-Detect Software has caused Ms. Whiting to incur additional costs, pain, scarring, deformity, and the need to undergo multiple surgeries.

199.    Defendant is, and at all times mentioned in this Complaint was, engaged in the business of designing, manufacturing, assembling, and selling a medical device product known as CoolSculpting System with the purpose of gaining profits from the distribution thereof.

200.    At all times relevant to this action, Defendant had a duty to exercise reasonable care, and to comply with inspection, labeling, marketing, promotions, and sale of the CoolSculpting treatment, as well as a duty to ensure patients would not suffer from unreasonable, dangerous, or untoward side effects.  Defendant introduced CoolSculpting into the stream of commerce.

201. At all times relevant to this action, Defendants had a duty to warn all health care providers and consumers of the risks, dangers, and adverse side effects of CoolSculpting treatment.

202. At all times relevant to this action, Defendant knew or reasonably should have known that CoolSculpting was unreasonably dangerous and defective when used as directed and as designed, including but not limited to the following:

    a. Patients can develop PAH, at a higher rate than disclosed to the FDA, which will create disfigurement at the treatment site;

    b. PAH cannot be treated immediately because patients must wait for tissue to soften from the CoolSculpting freeze;

    c. Fat reduction is not as significant as advertised;

    d. Fat reduction is not permanent;

    e. Defendant, not the physician, controlled the CoolSculpting treatment through "Freeze Detect" software technology.

203. Defendant failed to exercise ordinary care in the creating, designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of its CoolSculpting device into interstate commerce. Defendant knew or should have known that its CoolSculpting device placed users at risk for developing serious and dangerous side effects, including but not limited to PAH, hernias, blood clots, nerve damage, permanent post-surgical growths, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

204. Based on what Defendant knew or should have known, Defendant deviated from principles of due care, deviated from standards of care, and were otherwise negligent. Defendant

had a duty to comply with the Food Drug & Cosmetic Act ("FDCA") and the regulations promulgated pursuant to it, but the Defendant, its agents, servants, and/or employees, violated the FDCA regulations by the following acts and/or omissions:

    a. Failed to disclose to CoolSculpting providers and the FDA all known PAH adverse events in violation of 21 C.F.R. § 803. Through Defendant's White Paper, "Medical Review Team" and refund or free liposuction program, Defendant gathered data showing that CoolSculpting did not perform as expected and/or caused higher rates of PAH. Defendant has not reported the lack of fat reduction or true rate of PAH to the FDA or CoolSculpting providers;

    b. Defendant failed to conduct sufficient testing to determine whether its CoolSculpting devices were safe for use and failed to anticipate the effect the procedure would have on healthy tissue prior to releasing the device for commercial distribution, in violation of 21 C.F.R. § 820.30(c), (d), (e), (f) and (g). Defendant knew or should have known that its CoolSculpting devices were unsafe and unreasonably dangerous because the CoolSculpting System can convert healthy tissue to fibrinous tissue, a condition the Defendant has coined as PAH. Ms. Whiting developed PAH due to CoolSculpting treatment;

    c. Failed to conduct adequate bio-compatibility studies to determine the CoolSculpting system's propensity to cause PAH in violation of 21 C.F.R. § 820.30(b) and (c);

    d. Failed to Follow FDA Design Control Regulations promulgated by 21 C.F.R. § 820.30(a)(1)(2)(i), which holds "Each manufacturer of any class III or class II device… shall establish and maintain procedures to control the design of the device

in order to ensure that specified design requirements are met." This includes devices like the CoolSculpting System with automated with computer software. Upon information and belief, Defendant did have recorded software events with the CoolSculpting system. Changes were made to the predicate K183514 system hardware and software to allow two treatments to be performed simultaneously. On July 5, 2021, Defendant issued a voluntary Class II recall of the CoolSculpting Elite System because the software had an incorrect error messaging system that could potentially lead to: 1) re-treating the affected anatomic area within 24 hours; or 2) failure to report a thermal event or other codes which would cause extended treatment in the affected anatomic area. As a result of the bugs, thermal events 1) may not lead to "thermal event" error message alert and treatment would not be stopped; or 2) the error text displayed may be unrelated and the provider would not know to avoid retreatment within 24 hours. These errors can result in cold-induced injury and second- or third-degree freeze burns. After sending two different Urgent Field Notices on July 13, 2021 and July 23, 2021, advising health care providers to update the software, a third notice was sent to healthcare providers via email on August 26, 2021 via email instructing them **to cease use of the CoolSculpting Elite Devices until further notice.** The updated communication instructed customers to refrain from using affected devices until the Recalling Firm notifies them because the software change needs to be submitted to FDA for review. The initial software updates in July of 2021 were not submitted to the FDA for review;

e. Defendants have misbranded the CoolSculpting System by advertising the device as "**FDA-cleared**" for the treatment of visible fat bulges in the submental (under

the chin) and submandibular (under the jawline) areas, thigh, abdomen, and flank, along with bra fat, back fat, underneath the buttocks (also known as banana roll), and upper arm. This is a clear violation of the misbranding statute codified at 21 C.F.R. § 807.97 that forbids any denotation of FDA approval of a Class I or Class II device simply because a manufacturer complies with "substantial equivalence." The misbranding statute further holds determination by the Commissioner that a device intended for introduction into commercial distribution because it is 1) substantially equivalent to a device in commercial distribution before May 28, 1976; or 2) substantially equivalent to a device introduced into commercial distribution after May 28, 1976 that has subsequently been reclassified into class I or II, does not in any way denote official approval of the device. Any representation that creates the impression that a device is officially approved by complying with premarket notification regulations is misleading and constitutes misbranding. Ms. Whiting saw the following statements about CoolSculpting: "CoolSculpting is the world's **#1 FDA-approved treatment option** providers turn to for nonsurgical fat reduction," "**CoolSculpting has been approved by the FDA,**" "**Clinical trials** have determined that CoolSculpting is a safe and effective way to reduce fat." These are fraudulently false representations made to Ms. Whiting, as the Defendant was not granted the right to market CoolSculpting based upon **clinical trials** nor is the device FDA approved;

f.  Failing to recall its dangerous and defective CoolSculpting devices at the earliest date it became known that the devices were dangerous and defective by failing to

identify, capture, and/or correct the CoolSculpting discrepancy/discrepancies, in violation of 21 C.F.R. § 820.80(c);

g.  Failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding the CoolSculpting system, returned components, and other quality problems associated with the components, in violation of 21 C.F.R. § 820.100;

h.  Failed to appropriately respond to adverse incident reports that strongly indicated the CoolSculpting system was malfunctioning, as defined in 21 C.F.R. § 803.3, or otherwise not responding to their design objective intent, in violation of 21 C.F.R. § 820.198. Through its "Medical Review Team," refund or free liposuction program, and physician reports of PAH, Defendants were aware that PAH is a common adverse event but failed to report these events to the FDA and healthcare providers or initiate a voluntary recall;

i.  Failed to conduct complete device investigations on adverse events of PAH caused by CoolSculpting in violation of 21 C.F.R. § 820.198. Defendant has failed to investigate and analyze the cause and long-term effects of PAH; and

205.  Continued to inject the CoolSculpting system into the stream of commerce when Defendant knew, or should have known, that one or more were malfunctioning, as defined in 21 C.F.R. § 803.3, or otherwise not responding to their design objective intent; and/or

206.  Defendant otherwise failed to comply with the applicable statutory requirements and terms of the conditional approval issued by the FDA, including but not limited to the off-label marketing restrictions and post-market surveillance requirements.

207.    As a direct and proximate result of Defendant's violations of one or more of these federal statutory and regulatory standards of care, the subject device and components, as applied to Ms. Whiting, failed and directly caused and/or contributed to the severe and permanent injuries sustained by Ms. Whiting, as defined in 21 C.F.R. § 803.3, as well as other damages alleged herein.

208.    As a consequence of Defendant's violations, Ms. Whiting endured pain and suffering, including humiliation, scarring, disfigurement, and additional invasive surgeries to remove fibrinous tissue. Ms. Whiting will continue to incur medical costs to treat the PAH.

209.    As a direct and proximate result of Defendants aforementioned actions, Ms. Whiting prays for judgment against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

210.    Plaintiff alleges that at the time the subject device and components left Defendant's control: 1) one or more were defective because they deviated from the manufacturers or designer's specifications in a material way; 2) such defective condition rendered them unreasonably dangerous to the user; and 3) such condition proximately caused the damages for which recovery is sought.

211.    Alternatively, Plaintiff alleges that at the time the subject components left Defendant's control: 1) one or more were designed in a defective manner; 2) such defective condition rendered them unreasonably dangerous to the user; and 3) such condition proximately caused the damages for which recovery is sought herein. Further: 1) Defendant knew, or in light of reasonably available knowledge and/or the exercise of reasonable care should have known, about the danger for which recovery is sought; and 2) the CoolSculpting system collectively failed to function as expected and a feasible design alternative existed that would have, with reasonable probability, have prevented the harm and injury which occurred to Ms. Whiting.

212.     This cause of action is based entirely on the contention that Defendants violated federal safety statutes and regulations. Plaintiff does not bring the underlying action as an implied statutory cause of action but is pursuing parallel state common law claims based upon Defendant's violations of applicable federal regulations.

213.     Under Florida law, Defendant's violations of the aforementioned federal statutes and regulations establish a prima facie case of strict liability in tort. Three types of strict product liability can be asserted in Florida: manufacturing defect, design defect, and failure to provide adequate warning. *Aubin v. Union Carbide Corp.,* 177 So. 3d 489, 495 (Fla. 2015).

**SECOND CLAIM FOR RELIEF**
**NEGLIGENT -DESIGN, MANUFACTURE, MISBRANDED**

214.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs, with the same force and effect as if fully set forth herein.

215.     Plaintiff is in the class of persons that Defendant should reasonably foresee as being subject to the harm caused by defectively designed CoolSculpting systems, as Ms. Whiting was the type of person for whom Coolsculpting was intended to be used.

216.     At all times herein mentioned, Defendant created, designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the CoolSculpting devices that was used by Ms. Whiting.

217.     That its CoolSculpting devices were expected to reach, and did reach, the usual consumers, handlers, and persons coming into contact with the device without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by Defendant.

218.    At all times herein mentioned, Defendant's CoolSculpting device were in defective condition and unsafe, and Defendant knew or had reason to know that the devices were defective and unsafe, especially when used in the form and manner recommended by the Defendant.

219.    In January 2018, when Ms. Whiting underwent a CoolSculpting treatment, the CoolSculpting System was a Class II medical device that was designed and/or manufactured by Defendants and placed into the stream of commerce.

220.    Based on what Defendant knew or should have known, Defendant deviated from principles of due care, deviated from standards of care, and were otherwise negligent. It was the duty of the Defendant to comply with the FDCA and the regulations promulgated pursuant to it, but the Defendant, its agents, servants, and/or employees, included but violated the FDCA regulations by the following acts and/or omissions:

a.  Failed disclose to CoolSculpting providers or the FDA all known PAH adverse events in violation of 21 C.F.R. § 803. Through Defendant's Secret White Paper, "Medical Review Team" and "LipoSuction Program", Defendant knew that CoolSculpting did not perform as expected and/or caused higher rates of PAH. Defendant has not reported the lack of fat reduction or true rate of PAH to the FDA or CoolSculpting providers;

b.  Not conducting sufficient testing programs to determine whether or not its CoolSculpting devices were safe for use by failing to validate the anticipated wear and/or reaction on healthy tissue prior to their release into commercial distribution, in violation of 21 C.F.R. § 820.30(c), (d), (e), (f) and (g). Defendant herein knew or should have known that its CoolSculpting devices were unsafe and unreasonably dangerous because the CoolSculpting System can convert healthy tissue to

fibrinous tissue which Defendant has coined PAH. Plaintiff developed fibrinous
tissue "aka" PAH due to CoolSculpting treatment.;

c.  Failed to conduct adequate bio-compatibility studies to determine the
CoolSculpting system's propensity to cause PAH in violation of 21 C.F.R. §
820.30(b), (c);

d.  Failed to Follow FDA Design Control Regulations 21 C.F.R. § 820.30(a)(1)(2)(i)
which holds "Each manufacturer of any class III or class II device… shall establish
and maintain procedures to control the design of the device in order to ensure that
specified design requirements are met. This includes devices like the CoolSculpting
System with automated with computer software. Upon information and belief,
Defendant did have recorded software events with the CoolSculpting system.
Changes were made to the predicate K183514 system hardware and software to
allow two treatments to be performed simultaneously. On July 5, 2021, Defendant
issued a voluntary Class II recall of the CoolSculpting Elite System because the
software had an incorrect error messaging system that could potentially lead to: 1)
Re-treating the affected anatomic area within 24 hours 2) Failure to report a thermal
event or other codes which would cause extended treatment in the affected
anatomic area where CoolSculpting provider would not be aware that a thermal
event has occurred. As a result of the bugs thermal events 1) may not lead to
"thermal event" error message alert and treatment would not be stopped; or 2) the
error text displayed may be unrelated and the provider would not know to avoid
retreatment within 24 hours. These could result in cold-induced injury and 2nd or
3rd degree freeze burns. After sending two different Urgent Field Notices on

7/13/21 and 7/23/21 advising health care providers to update the software, a third notice was sent to healthcare providers on 08/26/2021 via email informing its customers *to cease use of the CoolSculpting Elite Devices until further notice*. The updated communication instructed customers to refrain from using affected devices until the Recalling Firm notifies them because the software change needs to be submitted to FDA for review. The initial software updates in July of 2021 were not submitted to the FDA for review;

e.  Defendants have misbranded the CoolSculpting System in advertisements by alleging the device is "**FDA-cleared**" for the treatment of visible fat bulges in the submental (under the chin) and submandibular (under the jawline) areas, thigh, abdomen, and flank, along with bra fat, back fat, underneath the buttocks (also known as banana roll), and upper arm. This is a clear violation of the Misbranding statute 21 C.F.R. § 807.97 that forbids any denotation of FDA approval of a Class I or Class II device simply because a manufacturer complies with "substantial equivalence". The Misbranding statute further holds determination by the Commissioner that the device intended for introduction into commercial distribution because it is substantially equivalent to a device in commercial distribution before May 28, 1976 or is substantially equivalent to a device introduced into commercial distribution after May 28, 1976, that has subsequently been reclassified into class I or II, does not in any way denote official approval of the device. Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding. Plaintiff saw the following statements

about CoolSculpting "CoolSculpting is the world's **#1 FDA-approved treatment option** providers turn to for nonsurgical fat reduction." **CoolSculpting has been approved by the FDA**. *Clinical trials* have determined that CoolSculpting is a safe and effective way to reduce fat. This is all fraudulently false representations made to Plaintiff because Defendant was not granted the right to market CoolSculpting based upon *clinical trials* nor is the device FDA approved.

f.  Failing to recall its dangerous and defective CoolSculpting devices at the earliest date that it became known that said its CoolSculpting devices were, in fact, dangerous and defective by failing to identify, capture and/or correct the CoolSculpting  discrepany(ies), in violation of 21 C.F.R. § 820.80(c);

g.  Failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding CoolSculpting system,  returned components, and other quality problems associated with the components, in violation of 21 C.F.R. § 820.100;

h.  Failed to appropriately respond to adverse incident reports that strongly indicated the CoolSculpting system was Malfunctioning [as defined in 21 C.F.R. § 803.3], or otherwise not responding to their Design Objective Intent, in violation of 21 C.F.R. § 820.198. Defendants "Medical Review Team", Liposuction Program" and physician complaints reported adverse events of PAH as a common adverse event and Defendants have largely ignored the clinical evidence by not reporting them to the FDA, healthcare providers or initiating a voluntary recall;

i.  Failed to conduct complete device investigations on adverse events of PH caused by CoolSculpting in violation of 21 C.F.R. § 820.198. Defendant has failed to investigate and analyze the cause and long-term effects of PAH; and/or

221.   Continued to inject the CoolSculpting system into the stream of commerce when Defendant knew, or should have known, that one or more were Malfunctioning [as defined in 21 C.F.R. § 803.3] or otherwise not responding to their Design Objective Intent; and/or

222.   Defendant otherwise failed to comply with the applicable statutory requirements and terms of the conditional approval issued by the FDA, including but not limited to the off-label marketing restrictions and post-market surveillance requirements.

223.   As a direct and proximate result of Defendant's violations of one or more of these federal statutory and regulatory standards of care, the subject components, as applied  to Plaintiff, failed and such failure directly caused and/or contributed to the severe and permanent injuries sustained by Plaintiff, as defined in 21 C.F.R. § 803.3, as well as other damages alleged herein.

224.   As a direct result, Plaintiff, Shantel Whiting, endured pain, and suffering, including pain, humiliation, scarring, disfigurement, additional invasive surgeries to remove fibrinous tissue, and will continue to incur medical costs to treat the PAH.

225.   Plaintiff alleges that at the time the subject components left Defendant's control, (i) one or more were defective because they deviated in a material way from the manufacturers or designer's specifications, (ii) such defective condition rendered them unreasonably dangerous to the user, and (iii) such condition proximately caused the damages for which recovery is sought herein.

226.   Alternatively, Plaintiff allege that at the time the subject components left Defendant's control, (i) one or more were designed in a defective manner, (ii) such defective

condition rendered them unreasonably dangerous to the user, and (iii) such condition proximately caused the damages for which recovery is sought herein. Further, (i) Defendant knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger for which recovery is sought herein, and (ii) the CoolSculpting system collectively failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability have prevented the harm and injury which occurred to Plaintiff.

227.    As a direct and proximate result of Defendants violations of one or more of these federal statutory and regulatory standards of care, the CoolSculpting System used on Ms. Whiting failed and directly caused and/or contributed to the severe and permanent injuries sustained and endured by Ms. Whiting, as defined in 21 C.F.R. § 803.3. Ms. Whiting has endured pain and suffering, including, but not limited to, additional debilitating and invasive surgeries, physical pain and suffering, mental anguish and emotional distress, humiliation, embarrassment, annoyance, and aggravation. Additionally, Ms. Whiting has incurred significant medical expenses, both past and present, and loss of wages, both past and present.

228.    This cause of action is based entirely on the contention that Defendants violated federal safety statutes and regulations. Plaintiff does not bring the underlying action as an implied statutory cause of action but is pursuing parallel state common law claims based upon Defendant's violations of applicable federal regulations.

229.    Under Florida law, Defendant's violations of the aforementioned federal statutes and regulations establish a prima facie case of negligence.

230.    As a direct and proximate result of Defendants aforementioned actions, Plaintiff prays for judgment against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

231.    Defendant created, designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to Ms. Whiting, in particular, and Defendant is liable for the injuries sustained by Ms. Whiting.

## THIRD CLAIM FOR RELIEF
## BREACH OF EXPRESS WARRANTY

232.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs, with the same force and effect as if fully set forth herein.

233.    Defendant knew that CoolSculpting treatment can cause tissue damage and permanent deformity to the user's body in the form of PAH. Defendant advertised CoolSculpting as a non-invasive procedure designed to reduce fat. None of Defendant's advertising, marketing, or informational materials viewed by the Plaintiff mentioned that CoolSculpting procedures could cause a condition that results in permanent disfigurement to the body that can only be resolved through invasive surgeries, resulting in the **opposite effect** of the device's advertised purpose.

234.    Plaintiff relied on the skill and judgment of the Defendant and Defendant's representations that the device was adequately tested and rendered safe for its intended use.

235.    Ms. Whiting became interested in and underwent the CoolSculpting procedure based on the Defendant's representation that the procedure could remove and/or kill fat permanently.

236.    Due to the innate defective nature of the CoolSculpting System device, Ms. Whiting and the individuals performing the CoolSculpting procedure on her, through the use of reasonable care, could not have discovered the defective nature of the CoolSculpting System device or its risks.

237.     As the direct and proximate result of Defendant's conduct, Plaintiff sustained serious injuries from the defective, unsafe, and unreasonably dangerous CoolSculpting device that could not safely be used for the purpose for which it was marketed, advertised, promoted, and intended. Specifically, Defendant's CoolSculpting device caused Plaintiff to suffer a permanent enlargement and hardening of fat tissue which can only be removed through invasive plastic surgery.

238.     As the direct and proximate result of Defendant's wrongful conduct, Ms. Whiting has experienced, and continues to experience, serious and dangerous side effects including but not limited to, PAH, as well as other severe personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

**FOURTH CLAIM FOR RELIEF**
**BREACH OF IMPLIED WARRANTY**

239.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs, with the same force and effect as if fully set forth herein.

240.     At all times herein mentioned, Defendant manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted, and sold its CoolSculpting devices to induce lipolysis.

241.     At the time Defendant marketed, sold, and distributed the CoolSculpting Device used on Ms. Whiting, Defendant knew the use for which its CoolSculpting device was intended and impliedly warranted the product to be of merchantable quality, safe, and fit for such use.

242.    Defendant impliedly represented and warranted to users of its CoolSculpting devices, and/or their physicians/healthcare providers, and/or the FDA, that its CoolSculpting devices were of merchantable quality, safe, and fit for their intended purpose.

243.    The aforementioned representations and warranties were false, misleading, and inaccurate as the CoolSculpting devices were unsafe, unreasonably dangerous, not of merchantable quality, and defective.

244.    Plaintiff and/or members of the medical community and/or healthcare professionals relied on these implied warranties of merchantability and fitness for a particular use and purpose.

245.    Plaintiff and/or her physicians and/or healthcare professionals reasonably relied upon the skill and judgment of the Defendant to determine whether the CoolSculpting devices were of merchantable quality, safe, and fit for their intended use.

246.    Defendant injected its CoolSculpting devices into the stream of commerce in a defective, unsafe, and inherently dangerous condition. These products and materials were expected to and did reach users, handlers, and persons coming into contact with the products without substantial change from the condition in which they were sold.

247.    Defendant herein breached the aforesaid implied warranties, as its CoolSculpting devices were neither merchantable nor fit for their intended purposes and uses.

248.    By reason of the foregoing, Plaintiff has experienced, and continues to experience, serious and dangerous side effects including but not limited to, PAH, as well as other severe personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

## FIFTH CLAIM FOR RELIEF
## STRICT LIABILITY- FAILURE TO WARN

249.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs, with the same force and effect as if fully set forth herein.

250.    Defendant is, and at all times mentioned in this Complaint was, engaged in the business of designing, manufacturing, assembling, and selling a medical device product known as CoolSculpting System with the purpose of gaining profits from the distribution thereof.

251.    Defendant directly or through its agents, apparent agents, servants, or employees designed, manufactured, tested, marketed, and commercially distributed the CoolSculpting System device that was used on Ms. Whiting.

252.    Defendant knew that its CoolSculpting System device was unreasonably dangerous, unsafe, and/or defective and could cause harm to those who used it, including Ms. Whiting. Specifically, Defendant knew that its medical device could cause the opposite effect of the device's advertised purpose in the form of PAH.

253.    Defendant knew that PAH is not preventable and is unavoidable if undergoing the CoolSculpting procedure.  Defendant also knew that there was a possibility that Ms. Whiting could develop PAH after undergoing the CoolSculpting procedure.

254.    Defendant had superior knowledge about PAH because it was in possession of facts and information about the condition not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. Defendant received thousands of reports of users developing the condition, had access to those users' medical records and information regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the public or medical community.

255.    Defendant had a duty to provide adequate warnings about PAH, a dangerous adverse effect of its CoolSculpting medical device, to Ms. Whiting's CoolSculpting provider.

256.    Defendant failed to provide adequate warnings to Ms. Whiting's CoolSculpting provider because the language used by Defendant to describe PAH in its training materials:

a.    Was inaccurate in content and ambiguous in manner of expression;

b.    Did not adequately inform the providers about a condition which is: 1) unfamiliar to the medical community; 2) is only associated with the CoolSculpting device; and 3) about which Defendant had superior knowledge;

c.    Creatively used insufficient and vague language that did not provide enough specificity about the condition, which was necessary for the CoolSculpting providers to know the risks of using the device;

d.    Misrepresented facts about the condition;

e.    Did not use concrete terms like "deformity" and "disfigurement" to describe PAH;

f.    Did not definitively state that PAH is a disease of the tissue;

g.    Did not definitively state that PAH can only be removed with invasive surgery;

h.    Did not warn that it is likely that multiple surgeries may be necessary to remove PAH;

i.    Did not disclose that a single patient can develop the condition in multiple areas;

j.    Did not disclose that PAH causes permanent cutaneous and subcutaneous tissue damage;

k.    Did not disclose that long term effects of PAH affected tissue are unknown;

l.    Did not disclose that even with surgery, patients affected by PAH may still be left with deformities on their body; and

m.   Used words such as "rare side effect" to imply that PAH is unlikely to occur, while knowing that the condition is not rare.

257.   Defendant is strictly liable for Plaintiff's damages because its product was defective due to its failure to adequately warn CoolSculpting providers about the danger of the CoolSculpting device, particularly the risk of PAH.

258.   As the direct and proximate result of Defendant's wrongful conduct, Plaintiff has experienced, and continues to experience, serious and dangerous side effects including but not limited to, PAH, as well as other severe personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

**SIXTH CLAIM FOR RELIEF**
**DEFENDANT LIABLE FOR NEGLIGENT ACTS/OMISSIONS OF AGENTS**

259.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs, with the same force and effect as if more set forth herein.

260.   Defendant by and through contracts, distributorship agreements, and kickbacks to physicians and/or clinics, established a business partnership with the physicians and/or clinics. Physicians and other CoolSculpting providers had both express and apparent authority to act for Defendant acted in concert with the business objectives and instructions laid out by Defendant, thereby making them one entity. The nature of this relationship eliminated the independent medical judgment of the physician.

Defendant and their agents had superior knowledge had superior knowledge about PAH because it was in possession of facts and information about the condition not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's

adverse effects, including PAH. Defendant received thousands of reports of users developing the condition, had access to those users' medical records and information regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the public or medical community.

261.    The CoolSculpting providers acted as the Defendant's agents in selling the CoolSculpting cycles, because Defendant, among other things, conducted itself in the following ways: 1) maintained control over the CoolSculpting cycles through its consumable card system; 2) shared profits with the providers on each cycle administered to patients; 3) provided forms and documents to the CoolSculpting providers with the CoolSculpting logo to use for CoolSculpting patients; 4) referred CoolSculpting patients to the CoolSculpting providers via its website; 5) controlled the advertised price of CoolSculpting; 6) controlled how patients were diagnosed with PAH resulting from CoolSculpting.

262.    Defendant and their agents owed a duty to protect Plaintiff from the unreasonable risk of using its CoolSculpting medical device, which it knew had the ability to cause permanent injury resulting in the opposite effect of the device's advertised purpose.

263.    **Duty to take Corrective and Preventive Actions.** Defendant had a duty to take corrective and preventive actions when it found out that the CoolSculpting device causes permanent deformities to patient's bodies.

264.    Defendant failed to exercise ordinary care when it: 1) failed to acknowledge that PAH is a *serious side effect* of the CoolSculpting device; and 2) failed to update its labeling for the CoolSculpting device to adequately describe the risk of PAH when it discovered the serious and permanent side effect associated with the device; or 3) failed to take the CoolSculpting device off the market when it discovered the serious and permanent side effect associated with the device.

265.     **Duty to Inform Providers.** Defendant had a duty to adequately inform Plaintiff's CoolSculpting provider that PAH, an adverse effect associated with Cryolipolysis and the CoolSculpting medical device: 1) causes cutaneous and subcutaneous tissue damage; 2) is a permanent deformity; 3) which will never resolve on its own; 4) which may affect a single patient in multiple treatment areas; 5) requires multiple plastic surgeries, per affected area, to remove; 6) causes the opposite of the intended result of CoolSculpting; 7) is more likely to develop in males; 8) may have long term effects, due to tissue damage; 9) may require additional treatment in the future; and 10) may not be resolved with plastic surgery.

266.     Defendant failed to exercise ordinary care by using misleading language to describe PAH to CoolSculpting providers/agents, failing to adequately inform them about the seriousness of the condition. Defendant concealed material facts about the condition from CoolSculpting providers/agents. Defendant made ambiguous and inaccurate statements about the effect PAH has on the body, its permanency, treatment options, and rate of risk in the written materials it furnished to Plaintiff's CoolSculpting provider/agent.

267.     Due to Defendant's failure to use ordinary care in contracting with and disclosing risks of PAH and other injuries with Plaintiff's CoolSculpting provider. The provider, due to lack of disclosure or conflict of interest, did not and/or refused to adequately inform Plaintiff about the risk of developing serious and permanent injuries from CoolSculpting. Consequently, Plaintiff and was induced to purchase CoolSculpting cycles, undergo the CoolSculpting procedure, and consequently suffered personal injuries and economic damages.

268.     **Duty to be Honest in Advertising CoolSculpting.** Defendant also had a duty to be honest in its advertisement materials directed at Plaintiff, such as commercials, website content,

and the brochures and posters that it furnished to the CoolSculpting providers to use in their offices. Specifically, Defendant had a duty:

     a.     Not to claim that the CoolSculpting procedure is a "non-invasive" and "non-surgical" alternative to liposuction;

     b.     Not to claim that the CoolSculpting procedure produced "long lasting results";

     c.     Not to claim that the CoolSculpting procedure "kills" fat cells;

     d.     Not to claim that the CoolSculpting procedure results in "up to 20%-25% reduction of fat in a treated area;"

     e.     To disclose that the CoolSculpting procedure may cause the opposite effect of what it claims to achieve;

     f.     To disclose that even after an initial reduction in fat, a person may develop PAH.

269.     Due to Defendant and their agent's failure to use ordinary care, Plaintiff was not aware that purchasing CoolSculpting cycles and undergoing the CoolSculpting procedure subjected her to a risk of developing permanent deformities of damaged fat tissue and skin laxity which require multiple invasive surgeries to remove.

270.     Consequently, Plaintiff was induced purchase CoolSculpting cycles, undergo the CoolSculpting procedure, and consequently suffered personal injuries and economic damages

271.     **Duty to Warn CoolSculpting Consumers.** Defendant and their agents created a system that forced CoolSculpting providers to rely on them to support their CoolSculpting business. Defendant was involved itself in every step of the CoolSculpting treatment, from attracting consumers through advertisement, furnishing CoolSculpting providers with patient-facing documents (including consent forms) that informed consumers about the procedure, profit-

sharing with agents on each cycle sold to the consumers, diagnosing the consumer with PAH, and offering to settle PAH claims which protected the CoolSculpting providers from liability.

272. Defendant's participation and control of physician agents in the consumers' medical treatment gave rise to a duty to warn the consumers directly about the danger of its medical device. It was unreasonable for the Defendant to rely on CoolSculpting providers to properly inform their patients about the risk of PAH under the business partnerships created by Defendant.

273. Defendant failed to exercise ordinary care when it unreasonably relied on CoolSculpting providers to inform CoolSculpting patients about the risk of PAH, knowing that: 1) the consent language used by providers did not accurately and adequately explain PAH to consumers; 2) PAH was the most serious adverse effect of CoolSculpting; 3) PHA was the most frequently reported adverse effect of CoolSculpting; 4) PAH created the opposite of the intended effect of CoolSculpting; and 5) CoolSculpting providers were incentivized with increased sales to conceal the truth about PAH and other injuries from their patients.

274. Due to Defendant's failure to use ordinary care, Plaintiff was not aware that purchasing CoolSculpting cycles and undergoing the CoolSculpting procedure subjected her to a risk of developing permanent deformities of damaged fat tissue and skin laxity which require multiple invasive surgeries to remove.

275. As the direct and proximate result of Defendant and their agent's wrongful conduct, Plaintiff has experienced, and continues to experience, serious and dangerous side effects including but not limited to, PAH, as well as other severe personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

## SEVENTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION AND FRAUDULENT CONCEALMENT

276.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs, with the same force and effect as if more fully set forth.

277.    Defendant had superior knowledge about PAH because it was in possession of facts and information about the condition not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. Defendant received thousands of reports of users developing the condition, had access to those users' medical records and information regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the public or medical community.

278.    The CoolSculpting providers acted as the Defendant's agents in selling the CoolSculpting cycles, because Defendant, among other things, conducted itself in the following ways: 1) maintained control over the CoolSculpting cycles through its consumable card system; 2) shared profits with the providers on each cycle administered to patients; 3) provided forms and documents to the CoolSculpting providers with the CoolSculpting logo to use for CoolSculpting patients; 4) referred CoolSculpting patients to the CoolSculpting providers via its website; 5) controlled the advertised price of CoolSculpting; and 6) controlled how patients were diagnosed with PAH resulting from CoolSculpting.

279.    **Severity.** Defendant knew that PAH is a disfigurement and a deformity to the body that is completely different from a normal "enlargement of fat" because PAH permanently damages the tissue it affects. Defendant also knew that many PAH patients also suffered cutaneous tissue damage resulting in skin laxity, which requires additional surgeries to reconstruct. Defendant misrepresented the consequences of PAH to CoolSculpting providers by creatively

using insufficient and ambiguous language to describe the condition and intentionally avoided using concrete terms that would fairly and accurately describe the adverse event.

280.     **Permanency.** Defendant knew that PAH will **never** resolve on its own and that the *only* means of removing it is through invasive plastic surgery. Despite this knowledge, Defendant used false language in describing PAH to CoolSculpting providers, downplaying the permanency of the condition, and stating that "surgical intervention **may** be required."

281.     **Frequency.** Based on the number of PAH reports Defendant received, it knew that the likelihood of developing PAH after CoolSculpting was **not** rare. Defendant concealed its knowledge of the unreasonably dangerous risks of its CoolSculpting device from the CoolSculpting providers, while simultaneously relying on phrases like "rare" and "small number" to induce CoolSculpting providers to believe that it is **unlikely** that a patient will develop the condition. Defendant concealed the fact that PAH was the most frequently reported adverse effect of CoolSculpting.

282.     Defendant's material misrepresentations about PAH and concealment of material information was motivated by profits. Since the majority of the Defendant's CoolSculpting profits are gained from the **use** of the device on consumers rather than sales of the device to providers, Defendant's conduct was highly driven by consumers' purchase of the CoolSculpting cycles.

283.     Defendant knew that the CoolSculpting providers' lack of knowledge and understanding about PAH would result in consumers being uninformed about the serious and permanent adverse effect. On the other hand, Defendant knew that if consumers knew that there was a risk of developing the opposite effect of CoolSculpting's advertised purpose, consumers would be unlikely to undergo the elective procedure.

284.     As the result of Defendant's superior knowledge about PAH, CoolSculpting providers justifiably relied on Defendant's representations about the adverse effect solely associated with Defendant's medical device. Believing that the adverse effect is unlikely to occur and is not serious nor permanent, CoolSculpting providers did not properly inform CoolSculpting patients about the risk of PAH. Information regarding PAH was material and necessary for the Plaintiff to make an informed decision about undergoing this elective procedure. Had the Plaintiff known that there was a risk that they could suffer the **opposite effect** of the CoolSculpting device's advertised purpose, they would not have purchased cycles of CoolSculpting.

285.     As the proximate result of Defendant's fraudulent conduct, Plaintiff suffered damages that include economic and non-economic losses.

## EIGHTH CLAIM FOR RELIEF
## PUNITIVE DAMAGES

286.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs, with the same force and effect as if more fully set forth.

287.     Through Defendant's conduct in deceiving CoolSculpting providers and/or convincing providers to participate in the "pay to play" scheme, the Plaintiff was not informed of the seriousness, permanency, and frequency of  PAH. Defendants' concealment of material information regarding the serious adverse effect of the CoolSculpting device, and deprivation of consumer access to important information about PAH, was so reckless that it constituted a conscious disregard or indifference to the life, safety, or rights of the device's users.

288.     Defendant, as a corporation, actively and knowingly participated in the dissemination of misrepresentations and concealment of material information related to its CoolSculpting device and PAH.

289.    Defendant and their agents' malicious and fraudulent conduct must be punished to deter them from causing future harm to others. Exemplary damages are warranted under that the circumstances.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff, respectfully requests this Court enter a judgment:

1.    Ordering the Defendants to pay compensatory damages to Plaintiff for pain and suffering, permanent disfigurement, medical costs incurred to restore and/or correct defects caused by CoolSculpting, mental anguish, and loss of enjoyment of life;

2.    Ordering the Defendants to pay punitive/exemplary/treble damages for the wanton, willful, fraudulent, and reckless conduct against Plaintiff ;

3.    Granting any and all other relief the Court may deem just and proper.

## **DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues raised in this Complaint.

This the March 1, 2022.


Respectfully Submitted,

SHANTEL WHITING

By:    */s/ Rachel Soffin*_____
Rachel Soffin
*Attorney for Plaintiff*
*Milberg Coleman Bryson Phillips Grossman*
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Telephone: (516) 741-5600
Fax: (516) 741-0128
rsoffin@milberg.com